UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DEXTER WASHINGTON,                   :   10 Civ. 7288 (RJS) (JCF)
                                     :
            Petitioner,              :      REPORT AND
                                     :   RECOMMENDATION
     - against -                     :
                                     :
JAMES WALSH, Superintendent,         :
Sullivan Correctional Facility,      :
                                     :
            Respondent.              :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:

     Dexter Washington brings this petition for a writ of habeas
corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for
two counts of burglary in the first degree, one count each of
robbery in the first degree and robbery in the second degree, and
one count of resisting arrest.  He contends that: (1) the evidence
at trial was legally insufficient to support his conviction; (2) he
did not have a "full and fair" probable cause hearing; (3) the
prosecutor failed to disclose material evidence to him; (4) he was
denied the right to represent himself pro se; (5) his pretrial and
appellate counsel were ineffective; (6) the trial court should have
conducted an independent source hearing prior to trial; (7) the
prosecutor changed her theory of the case, thus denying him a fair
and impartial trial; (8) the trial judge improperly interfered in
the trial proceedings; and (9) he was improperly sentenced.  For
the following reasons, I recommend that the petition be denied.

Background

    A. The Crime

Around 1:00 p.m. on October 25, 1996, Clara Sanchez was in her apartment at 790 Riverside Drive in Manhattan. (Trial Transcript ("Tr.") at 411, 415, 418, 420). Her friend Elena Yunen was visiting with her in the kitchen, and a houseguest, Dominique Phillipeaux, was in one of the bedrooms. (Tr. at 419-20, 650-51, 653-54). Ms. Sanchez, who was retired, sold clothing, jewelry, and housewares out of her apartment. (Tr. at 414-15). Ms. Sanchez received a call she believed came from the lobby of her building; when she answered, a male voice said that he was calling from Federal Express and had a package for her. (Tr. at 420-21, 468). Ms. Sanchez told the caller that she would come down to the lobby to receive the package, but ten minutes later her doorbell rang. (Tr. at 421-22). When she looked through the peephole, she saw a man holding a box who said that he was there to deliver a package. (Tr. at 422-23, 473). However, when Ms. Sanchez opened the door, the man pushed the door into her, knocking her to the floor, and threw the box at her. (Tr. at 423-24, 473-76, 655).

The man, whom Ms. Sanchez identified at trial as Dexter Washington, then dragged her into the kitchen and began punching her in the face. (Tr. at 423-24, 426-27, 477-78, 656). He placed his foot on her back and continued punching her and banging her

head against the kitchen floor as he demanded money and jewelry. (Tr. at 424-25, 480).   Mr. Washington took the necklaces and bracelet Ms. Sanchez was wearing and put them in his pants pocket. (Tr. at 430-32).   After beating Ms. Sanchez, he pulled out a knife from one of the kitchen drawers.   (Tr. at 425-26, 656).   He held it to Ms. Sanchez's neck and threatened to kill her if she did not give him money and jewelry.   (Tr. at 428-29, 484).   He then took Ms. Sanchez and Ms. Yunen into Ms. Sanchez's bedroom and began to rifle through her belongings, searching for jewelry.   (Tr. at 431-33, 487-88).   Although Ms. Sanchez did not see Mr. Washington take money from among her things, she later discovered that $300 was missing from her dresser.   (Tr. at 443-45).

At that moment, the doorbell rang.   (Tr. at 433-34).   Mr. Washington told the women to stay in the bedroom and went into the hallway.   (Tr. at 434).   Upon returning, he told Ms. Sanchez that he had to leave the apartment immediately and asked her where her fire escape was located.   (Tr. at 435, 668).   He then left the bedroom.   (Tr. at 435).   Ms. Sanchez went to the front door, where she found Sergeant Lyle J. Alexa and Officer Brenden Pedrosa of the New York City Police Department (the "NYPD"); the officers had come in response to several calls reporting a violent dispute, possibly involving a weapon, in Ms. Sanchez's apartment.   (Tr. at 32, 34-35, 50-51, 289, 290-91, 435-36, 668, 707).   Ms. Sanchez told the

3

officers that there was a man in her apartment who was trying to kill her. (Tr. at 36, 291, 436). She also told them that Mr. Washington had threatened her with a knife and might still have it in his possession. (Tr. at 291, 304). The officers found Mr. Washington in Ms. Sanchez's apartment and tried to take him into custody, but he fled from them after a struggle and ran out of the building. (Tr. at 36-40, 292-94). Before Mr. Washington's escape, Sergeant Alexa had succeeded in placing a pair of handcuffs on his right wrist; his shirt had also come off in the struggle, leaving him clothed in only sneakers and a pair of black pants. (Tr. at 41-42, 53, 102, 188, 293-94, 438).

Two other officers, Ron Colon and Richard Olmo, arrived at the scene during the struggle, and they, along with Sergeant Alexa and Officer Pedrosa, pursued Mr. Washington out of Ms. Sanchez's apartment building and into a nearby cemetery. (Tr. at 43-44, 97, 99, 102-05, 189-91, 193-96, 294-95). Mr. Washington was taken into custody there by Detective Robert Yarbrough, who was responding to a police radio call reporting that officers were in pursuit of a man fleeing a dispute with a gun. (Tr. at 46, 225, 227, 234, 261-62, 274). At the time of his arrest, Mr. Washington was shirtless, wearing black jeans, "sweating profusely," and had a pair of handcuffs on one wrist. (Tr. at 106, 229, 233). Detective Yarbrough searched Mr. Washington's pants pockets and recovered

4

money and jewelry.  (Tr. at 109, 234-35).

   B. The Trial

   A bail hearing was held on October 27, 1996, at which Justice
Arlene D. Goldberg of New York County Criminal Court ordered Mr.
Washington held on $50,000 bail.  (Hearing Transcript dated Oct.
27, 1996 ("10/27/96 H. Tr.") at 8).  At the hearing, Mr. Washington
was represented by Daniel Scott.  (10/27/96 H. Tr. at 1).  He was
subsequently indicted on November 25, 1996, on two counts of
burglary in the first degree, one count each of robbery in the
first and second degrees, and one count of resisting arrest.
(Petitioner's Memorandum of Law ("Pet. Memo.") at 7).  Although he
had provided the prosecution with written notice of his intent to
testify in front of the grand jury, Mr. Washington was not produced
and thus was unable to testify.  (10/27/96 H. Tr. at 2; Pet. Memo.
at 78-79).

   On March 29, 1997, a pretrial hearing was held in New York
State Supreme Court before Justice J.A.K. Bradley.  (Motions
Transcript dated March 35, 1997[1] ("3/29/97 H. Tr.") at 1).  Justice
Bradley denied various of the petitioner's motions, which had been
filed pro se, including a motion to dismiss the indictment and a

_____

   [1] The respondent explains that this transcript is improperly
dated and that the actual date of the hearing was March 29, 1997.
(Memorandum of Law in Opposition to the Petition for a Writ of
Habeas Corpus ("Resp. Memo.") at 51 & n.16).

motion for a subpoena to obtain a copy of the felony complaint. (3/29/97 H. Tr. at 2-3).   Although Mr. Washington was initially represented at this hearing by Mr. Scott, he soon moved to proceed pro se, a motion that Justice Bradley granted after inquiring into the petitioner's educational background and legal knowledge. (3/29/97 H. Tr. at 3-4, 7-14).

On June 4, 1997, a suppression hearing was held in New York Supreme Court before Justice Antonio Brandveen.   The petitioner sought (1) to suppress statements he made to the police following his arrest, (2) to suppress the introduction of the jewelry and money found in his pocket by Detective Yarbrough, (3) to challenge the probable cause underlying his arrest, and (4) to suppress the prosecutor's identification evidence.   (Huntley-Mapp Hearings Transcript dated June 4, 1997 ("6/4/97 H. Tr.") at 17-19).   Once the hearing had begun, however, the prosecutor, Susan Broderick, argued that there was no need for a hearing on identification because she was not planning to introduce at trial any police-arranged identification evidence -- for example, an identification made pursuant to a line-up or photo array.  (6/4/97 H. Tr. at 18). Justice Brandveen agreed, and the hearing proceeded only with respect to the other issues.  (6/4/97 H. Tr. at 20-21).   At the conclusion of the hearing, Justice Brandveen granted the petitioner's request to suppress his statement on the ground that

it was made in the course of an interrogation that took place after Mr. Washington had invoked his right to counsel. (6/4/97 H. Tr. at 175-77). However, the court denied the petitioner's other two requests, finding that there was probable cause for the officers to arrest Mr. Washington and therefore that the money and jewelry found in his pocket were not improperly obtained. (6/4/97 H. Tr. at 177-79). Justice Brandveen also reiterated his conclusion that any identification testimony provided by the police officers at trial would be admissible because it was based on their spontaneous observations of the petitioner at the scene of the crime, not on any police-arranged procedure. (6/4/97H. Tr. at 179-80).

The trial began on June 5, 1997 before Justice Brandveen. (Transcript dated June 5, 1997, at 1; Tr. at 1, 19). The prosecution called twelve witnesses, including Sergeant Alexa, Officer Colon, Officer Olmo, Detective Yarbrough, Officer Pedrosa, Ms. Sanchez, Ms. Yunen, and Joseph Bentivegna, the EMT who initially treated Ms. Sanchez's injuries. (Tr. at 577, 581-84). The petitioner represented himself pro se throughout the trial and did not testify. On June 19, 1997, the jury returned a verdict of guilty on all counts of the indictment. (Tr. at 1023-24).

A sentencing hearing was held on October 7, 1997, at which Ms. Broderick sought to have Mr. Washington adjudicated a second violent felony offender pursuant to New York Penal Law § 70.04,

7

which would enhance his sentence to a determinate term of ten to twenty-five years. N.Y. Penal Law § 70.04(3)(a). To be sentenced as a second violent felony offender, the defendant must have been convicted of a violent felony within the past ten years; however, that ten-year period is tolled for "any period of time during which the person was incarcerated for any reason between the time of commission of the previous felony and the time of commission of the present felony." N.Y. Penal Law § 70.04(1). To prove Mr. Washington qualified for this sentencing enhancement, Ms. Broderick presented evidence indicating that Mr. Washington had been convicted of robbery in the first degree, a violent felony, in the Bronx in 1977. (PFA Hearing Transcript dated Oct. 7, 1997 ("10/7/97 H. Tr.") at 9-11). However, Mr. Washington disputed that he was the same Dexter Washington who had been convicted in 1977 and argued that, even if he was the same person, the prosecution had not met its burden of establishing that he had been incarcerated for long enough to toll the statute until ten years prior to his current conviction. (10/7/97 H. Tr. at 12-17); N.Y. Penal Law § 70.04(1)(iv), (v). Justice Brandveen adjourned the hearing to October 15, 1997 to resolve these issues. (10/7/97 H. Tr. at 26). When the proceedings resumed, the prosecution provided evidence that Mr. Washington was the same person convicted of first degree robbery in 1977 and that he had remained incarcerated until

December of 1989, a sufficient period to trigger the sentencing enhancement. (Sentencing Transcript ("S. Tr.") at 6-8). Justice Brandveen then sentenced Mr. Washington to a determinate term of twenty-five years in prison. (S. Tr. at 49).

C. Subsequent Proceedings

In 1999, the petitioner filed a pro se motion pursuant to New York Criminal Procedure Law ("CPL") § 440.10 to vacate his conviction due to the prosecutor's failure to turn over Ms. Sanchez's arrest record prior to trial. (Affidavit of Dexter Washington in Support of Motion to Vacate Judgment dated Sept. 16, 1999 ("Washington 9/16/99 Aff."), attached as part of Exh. A to Declaration of Leilani Rodriguez dated Feb. 3, 2011 ("Rodriguez Decl.") at 4 & ¶¶ 4, 11). This motion was denied on the ground that Ms. Sanchez did not have a criminal record; Mr. Washington appealed, and the Appellate Division combined his appeal with the direct appeal of his conviction. (Order dated Dec. 3, 1999 ("12/3/99 Order"), attached as Exh. C to Rodriguez Decl.; Certificate Granting Leave dated Feb. 4, 2000, attached as Exh. D to Rodriguez Decl.). That direct appeal was filed on July 10, 2000, by Timothy Lewis, Mr. Washington's appellate counsel. (Brief for Defendant-Appellant ("Pet. App. Brief"), attached as Exh. E to Rodriguez Decl.). Mr. Lewis argued three points: (1) that the prosecution had failed to provide sufficient evidence to support

Mr. Washington's convictions for burglary in the first degree and robbery in the second degree, (2) that the trial court was wrong to deny the petitioner's motion to suppress the money and jewelry found in his pocket, and (3) that the prosecutor wrongfully failed to disclose either Ms. Sanchez's criminal record or the tape of police radio transmissions made during the crime and its aftermath. (Pet. App. Brief at 20, 27, 35).  The petitioner also submitted a pro se supplemental brief that presented nine additional points, claiming (1) further errors in the suppression hearing, (2) further non-disclosures of material evidence by the prosecutor, (3) failure to hold an independent source hearing, (4) denial of his right to proceed pro se, (5) ineffective assistance of counsel, (6) loss of his opportunity to testify in front of the grand jury, (7) fraud in his trial, (8) improper behavior by the prosecutor and trial judge, and (9) unlawful sentencing.  (Supplemental Brief for Appellant ("Supp. Brief"), attached as Exh. F to Rodriguez Decl.).  On April 24, 2001, the Appellate Division, First Department, affirmed the denial of the petitioner's § 440.10 motion and affirmed his conviction and sentence.  People v. Washington, 282 A.D.2d 375, 726 N.Y.S.2d 5 (1st Dep't 2001) ("Washington I").  Mr. Washington subsequently filed timely motions to reargue the appeal and for leave to appeal to the New York Court of Appeals, both of which were denied.  (Motion for Reargument, attached as Exh. I to

Rodriguez Decl.; Order dated July 5, 2001, attached as Exh. K to Rodriguez Decl.); People v. Washington, 96 N.Y.2d 925, 732 N.Y.S.2d 643 (2001) (Table) ("Washington II").

The petitioner has filed a slew of other pro se state court motions over the past ten years, all of which have been denied. These filings include two Article 78 petitions -- one challenging the New York County District Attorney's refusal to provide him with Ms. Sanchez's arrest records and the other contesting his sentence and continued detention. (Petition dated June 8, 2000, attached as Exh. M to Rodriguez Decl.); Washington v. Lippman, 30 A.D.3d 299, 818 N.Y.S.2d 38 (1st Dep't 2006). Mr. Washington also filed two coram nobis petitions with the Appellate Division, asserting ineffective assistance of his appellate counsel. (Pet. Memo. at 1; Resp. Memo. at 17 & n.5; Notice of Motion dated Aug. 11, 2006, attached as Exh. VV to Rodriguez Decl.). Both motions were denied, but Mr. Washington only attempted to appeal the second to the Court of Appeals, which denied leave on the ground that the underlying decision was not appealable. (Appeal dated Feb. 12, 2007, attached as Exh. YY to Rodriguez Decl.; Certificate Dismissing Application dated Feb. 27, 2007 ("2/27/07 Certificate"), attached as Exh. ZZ to Rodriguez Decl.). In 2002, the petitioner filed a motion to set aside his sentence pursuant to CPL § 440.20, arguing that his presentence report was invalid. (Affidavit of Dexter Washington in

11

Support of Motion to Vacate Judg[]ment dated Feb. 24, 2002, attached as part of Exh. P to Rodriguez Decl., ¶ 6). This motion was denied by the Supreme Court, that decision was affirmed by the Appellate Division, and Mr. Washington's subsequent appeal to the Court of Appeals was dismissed as untimely. (Order dated May 13, 2002, attached as part of Exh. R to Rodriguez Decl.; Order dated Oct. 26, 2004, attached as Exh. Y to Rodriguez Decl.); People v. Washington, 7 N.Y.3d 783, 820 N.Y.S.2d 544 (2006) (Table).

In addition, Mr. Washington has filed four other motions -- in 2005, 2006, 2007, and 2009 -- seeking to vacate his conviction and set aside his sentence pursuant to CPL §§ 440.10 and 440.20. (Motion to Vacate Conviction and Sentence, attached as Exh. CC to Rodriguez Decl.; Motion to Vacate Judgment, attached as Exh. AAA to Rodriguez Decl.; Pet. Memo. at 2-3; Resp. Memo. at 23 & n.9, 24 & n.10). These motions raised claims similar to those raised on direct appeal, including that the grand jury indictment was invalid, that the sentence was improper, and that other technical errors undermined the validity of the trial and sentence. (Affidavit of Dexter Washington in Support of Motion to Vacate Conviction and Sentence dated March 9, 2005, attached as part of Exh. CC to Rodriguez Decl., ¶ 9; Affidavit of Dexter Washington in Support of Motion to Vacate Judgment dated Oct. 16, 2006, attached as part of Exh. AAA to Rodriguez Decl., ¶¶ 9-11; Pet. Memo. at 2-3;

Resp. Memo. at 23-24). Each of these motions was denied, and the petitioner appealed all of them to the extent he was granted permission to do so. (Decision dated June 30, 2005, attached as Exh. EE to Rodriguez Decl.; Certificate Denying Leave dated Oct. 6, 2005, attached as Exh. HH to Rodriguez Decl.; Certificate Dismissing Application dated Jan. 9, 2006, attached as Exh. JJ to Rodriguez Decl.; Decision dated Dec. 14, 2006, attached as Exh. CCC to Rodriguez Decl.; Decision dated March 15, 2007, attached as Exh. EEE to Rodriguez Decl.; Certificate Denying Leave dated May 16, 2007, attached as Exh. III to Rodriguez Decl.; Certificate Denying Leave dated March 11, 2008, attached as Exh. NNN to Rodriguez Decl.; Decision dated Dec. 9, 2009, attached as Exh. QQQ to Rodriguez Decl.; Decision dated March 23, 2010, attached as Exh. SSS to Rodriguez Decl.; Certificate Denying Leave dated June 30, 2010, attached as Exh. UUU to Rodriguez Decl.; Certificate Dismissing Application dated Sept. 10, 2010, attached as Exh. WWW to Rodriguez Decl.).

Finally, Mr. Washington filed three state habeas petitions, all of which were dismissed as meritless. (Petition for Writ of Habeas Corpus dated Dec. 31, 2004, attached as Exh. NN to Rodriguez Decl.; Order dated May 6, 2005, attached as Exh. PP to Rodriguez Decl.; Order dated June 9, 2006, attached as Exh. UU to Rodriguez Decl.; Pet. Memo. at 4; Resp. Memo. at 22 & n.8, 23-24); <u>People ex</u>

rel. Washington v. NaPoli, 69 A.D.3d 1066, 894 N.Y.S.2d 181 (3d Dep't 2010); People ex rel. Washington v. Graham, 64 A.D.3d 1181, 881 N.Y.S.2d 351 (4th Dep't 2009).  He filed the current petition on September 7, 2010.

Discussion

    A.   Standard of Review

    Under the Antiterrorism and Effective Death Penalty Act (the "AEDPA"),

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "The 'contrary to' and 'unreasonable application' clauses [of § 2254(d)] have independent meanings." Douglas v. Portuondo, 232 F. Supp. 2d 106, 111 (S.D.N.Y. 2002) (citing Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000)).  A state court decision violates the "contrary to" clause of § 2254(d)(1) when it "reaches a result opposite to the one reached by the Supreme Court on the same question of law or arrives at a result opposite to the one reached by the Supreme Court on a 'materially indistinguishable' set of facts."  Corines v.

14

Superintendent, Otisville Correctional Facility, 621 F. Supp. 2d 26, 31 (E.D.N.Y. 2008) (quoting Earley v. Murray, 451 F.3d 71, 74 (2d Cir. 2006)).  To determine if a decision is an unreasonable application of clearly established federal law under the AEDPA, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 786 (2011).  The AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents" but "goes no farther." Id.

        In order for a federal court to review a state court decision at all, the petitioner must first have exhausted available state court remedies.  Duckworth v. Serrano, 454 U.S. 1, 3 (1981) (per curiam); see also 28 U.S.C. § 2254(b)(1); Aparicio v. Artuz, 269 F.3d 78, 89 (2d Cir. 2001).  Exhaustion requires that the factual and legal basis for each claim be fairly presented to the highest available state court, and that the petitioner utilize "'all available mechanisms to secure appellate review of the denial of'" that claim.  Mayen v. Artist, No. 06 Civ. 14261, 2008 WL 2201464,

at *4 (S.D.N.Y. May 23, 2008) (quoting <u>Klein v. Harris</u>, 667 F.2d 274, 282 (2d Cir. 1981)); <u>see also</u> 28 U.S.C. § 2254(c).  "In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." <u>Daye v. Attorney General of New York</u>, 696 F.2d 186, 191 (2d Cir. 1982) (en banc); <u>accord</u> <u>Jones v. Keane</u>, 329 F.3d 290, 294-95 (2d Cir. 2003).  Finally, even when a claim is not exhausted, a district court may reach the merits to deny the petition.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); <u>see also</u> <u>Lurie v. Wittner</u>, 228 F.3d 113, 124 (2d Cir. 2000).

Habeas corpus review is further limited in that a "claim resolved on independent and adequate state procedural grounds is generally not subject to review on habeas." <u>Dunn v. Sears</u>, 561 F. Supp. 2d 444, 452 (S.D.N.Y. 2008) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991)).  A state procedural bar qualifies as an "independent and adequate" state law ground if "'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" <u>Olba v. Unger</u>, 637 F. Supp. 2d 201, 207 (S.D.N.Y. 2009) (quoting <u>Levine v.</u>

16

<u>Commissioner of Correctional Services</u>, 44 F.3d 121, 126 (2d Cir. 1995)).   A state procedural rule will generally be adequate to preclude habeas review if it is "'firmly established and regularly followed.'" <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002) (quoting <u>James v. Kentucky</u>, 466 U.S. 341, 348 (1984)).   Additionally, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" <u>Grey v. Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991) (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 263 n.9 (1989)).   Nonetheless, "[f]ederal review [of procedurally barred claims] is permissible if the petitioner can demonstrate any one of the following circumstances: (1) actual innocence of the crime charged; (2) cause for the procedural default resulting in prejudice; or (3) that the procedural bar that the state court applied is not adequate." <u>Dunn</u>, 561 F. Supp. 2d at 452-53 (internal citations omitted).

Mr. Washington has timely filed his petition pursuant to the AEDPA's statute of limitations.   (Pet. Memo. at 4; Resp. Memo. at 25-28); <u>see also</u> 28 U.S.C. § 2244(d)(1).   Therefore, the AEDPA's exhaustion requirements and standard of review will be applied to each of the claims raised in his petition.

B. <u>Sufficiency of the Evidence</u>

The Due Process Clause of the Fourteenth Amendment requires

criminal convictions to be supported by proof beyond a reasonable doubt for every element of the crime with which the defendant is charged. Ponnapula v. Spitzer, 297 F.3d 172, 181 (2d Cir. 2002) (citing In re Winship, 397 U.S. 358, 364 (1970)). When evaluating a prisoner's sufficiency of the evidence claim, courts must ask "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Santos v. Zon, 206 F. Supp. 2d 585, 588 (S.D.N.Y. 2002) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). When considering the sufficiency of a state law conviction, a court "must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999).

Mr. Washington properly exhausted his sufficiency of the evidence claim by asserting it in his direct appeal and then attempting to appeal to the Court of Appeals. (Pet. App. Brief at 20-26); Washington II, 96 N.Y.2d 925, 732 N.Y.S.2d 643.

Turning to the merits of his claim, the petitioner first states that the evidence was insufficient to support his convictions for robbery and burglary because the prosecutor failed to prove that Ms. Sanchez suffered "serious physical injury." (Pet. Memo. at 12-17). However, the petitioner is mistaken as to

18

the elements of burglary in the first degree and robbery in the second degree under New York law -- neither demands proof of "serious physical injury"; rather, they require a showing of "physical injury" alone.  N.Y. Penal Law §§ 140.30, 160.10.  As defined by New York law, "physical injury" is an "impairment of physical condition or substantial pain."   N.Y. Penal Law § 10.00(9).  And while New York courts have made clear that "'petty slaps, shoves, kicks and the like delivered out of hostility, meanness and similar motives'" are insufficient to constitute physical injury, Mustafaj v. Holder, 369 Fed. Appx. 163, 168 (2d Cir. 2010) (quoting People v. Henderson, 92 N.Y.2d 677, 680, 685 N.Y.S.2d 409, 410 (1999)), the injuries experienced by Ms. Sanchez -- redness, cuts, and swelling in the face, a black eye, pain in her jaw and face, and back pain requiring the ongoing use of a cane -- are more than sufficient to meet the definition of physical injury.  (Tr. at 295-96, 299-300, 429-30, 446-48, 583); see also, e.g., People v. Witt, 56 A.D.3d 324, 325, 868 N.Y.S.2d 18, 19 (1st Dep't 2008) (finding physical injury where "defendant banged [victim's] head against a concrete or brick wall, causing a lump on the back of her head which lasted about two weeks"); People v. Haith, 44 A.D.3d 369, 370, 844 N.Y.S.2d 10, 11 (1st Dep't 2007) (same where defendant "knocked [victim] to the ground and dragged her along the street, causing abrasions, bruising and swelling");

19

People v. Stapleton, 33 A.D.3d 464, 465, 823 N.Y.S.2d 32, 33 (1st Dep't 2006) (same where defendant punched victim twice, causing "a swollen temple" and pain lasting for two days); People v. James, 2 A.D.3d 291, 291, 769 N.Y.S.2d 38, 38 (1st Dep't 2003) ("The element of physical injury was established by evidence that defendant punched the victim twice in the face during the robbery, causing pain, swelling and headaches.").

With respect to robbery in the first degree, however, Mr. Washington is correct that the statute refers to "serious physical injury":

> A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:
>
> 1. Causes serious physical injury to any person who is not a participant in the crime; or
>
> 2. Is armed with a deadly weapon; or
>
> 3. Uses or threatens the immediate use of a dangerous instrument . . . .

N.Y. Penal Law § 160.15. As is evident from the language of this statute, however, a prosecutor is not required to prove "serious physical injury" if it is shown that the defendant used or threatened to use a "dangerous instrument" while committing the crime. N.Y. Penal Law § 160.15(3). A "dangerous instrument" is defined as "any instrument, article or substance, . . . which,

20

under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13). New York courts take a "use-oriented approach" to determining whether an object is as a "dangerous instrument." Under this approach, it is the purpose to which the object was put, rather than the inherent nature of the object itself, that is the focus of the analysis. See People v. Juarez, 13 Misc. 3d 1131, 1137-39, 827 N.Y.S.2d 564, 568-70 (Westchester Cnty. Ct. 2006) (observing that "an otherwise innocuous kitchen knife may become a 'dangerous instrument' if used 'in a manner which renders it readily capable of causing serious physical injury'" (quoting People v. Carter, 53 N.Y.2d 113, 116, 440 N.Y.S.2d 607, 608-09 (1981))).

Here, the evidence at trial showed that Mr. Washington used a kitchen knife as a weapon to threaten and intimidate Ms. Sanchez. He pulled back Ms. Sanchez's head, held the knife to her throat, and told her that he would use it to kill her if she did not give him money and jewelry. (Tr. at 428). There is therefore no question that his use of the kitchen knife qualifies it as a dangerous instrument. Mr. Washington argues that because the testimony indicated he had already removed Ms. Sanchez's jewelry before picking up the kitchen knife and that he put down the knife before attempting to take any further property, the knife was not

used "in commission of" the robbery.   (Traverse Petitioner's
Memorandum of Law ("Pet. Reply Memo.") at 10-12; Tr. at 480-81,
488, 524).   This creative reading of the statute does not comport
with New York law and thus fails to support the petitioner's
argument.   Cf. People v. Ford, 11 N.Y.3d 875, 878, 874 N.Y.S.2d
859, 860-61 (2008) (finding § 160.15(3) met where defendant told
victim he had knife and gestured toward his pants pocket but never
revealed weapon); People v. Gill, 191 A.D.2d 321, 322, 595 N.Y.S.2d
46, 47 (1st Dep't 1993) (finding defendant's use of razor blade to
escape robbery scene sufficient to fulfill § 160.15(3)).
Therefore, the evidence at trial was sufficient to sustain the
petitioner's conviction for robbery in the first degree.

     Mr. Washington next argues that the evidence was insufficient
to support his convictions because Ms. Sanchez was not a credible
witness.   (Pet. Memo. at 17-22).   However, it is "well established
that questions of witness credibility are jury questions and a
federal habeas court may not reassess the jury's finding of
credibility."   Jackson v. Heath, No. 10 Civ. 3449, 2010 WL 3075557,
at *14 (S.D.N.Y. Aug. 6, 2010).   Similarly, the petitioner's claim
that the evidence was insufficient because (1) some of the witness'
testimony was contradictory and (2) the prosecutor failed to
advance a credible theory explaining how he gained entry to Ms.
Sanchez's building are insufficient to call the jury's verdict into

question.  (Pet. Memo. at 22-26); <u>Cruz v. Ercole</u>, No. 07 Civ. 9868, 2010 WL 245038, at *8 (S.D.N.Y. Jan. 20, 2010) ("[T]he fact that the jury chose to credit the testimony of certain of the prosecution's witnesses or resolved inconsistencies in the prosecution's favor does not undermine the reliability of the jury's verdict."), <u>report and recommendation adopted</u>, 2010 WL 4860668 (S.D.N.Y. Nov. 29, 2010).  Viewing all of the evidence adduced at trial in the light most favorable to the prosecution, a rational jury could have found all of the elements of the charged crimes beyond a reasonable doubt.  Therefore, the Appellate Division's decision denying this claim was reasonable.

    C. <u>Probable Cause Hearing</u>

    "'[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.'"  <u>Graham v. Costello</u>, 299 F.3d 129, 131 (2d Cir. 2002) (quoting <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976)).  A state denies a petitioner a "full and fair" opportunity to litigate only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that

mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992); accord Johnson v. Graham, No. 09 Civ. 5838, 2010 WL 3855286, at *4 (S.D.N.Y. Oct. 1, 2010). With respect to the first requirement, "[i]t is well-settled that New York's procedure for litigating Fourth Amendment claims is constitutionally adequate." Gonzalez v. Connolly, No. 09 Civ. 3834, 2010 WL 1005168, at *4 (S.D.N.Y. March 18, 2010). With respect to the second, an "unconscionable breakdown" occurs "where the petitioner demonstrates that no state court conducted a reasoned method of inquiry into relevant questions of fact and law, or any inquiry at all into the Fourth Amendment claim." Lebron v. Sanders, No. 02 Civ. 6327, 2008 WL 793590, at *9 (S.D.N.Y. March 25, 2008) (internal quotations marks and alteration omitted).

The petitioner does not deny that the trial court held a pretrial suppression hearing. (Pet. Memo. at 26-31). However, he argues that an "unconscionable break-down" occurred in those proceedings as demonstrated by the fact that(1) the jewelry and money found in his pocket by the police was not suppressed despite the inconsistent testimony of Detective Yarbrough, (2) the prosecutor was not penalized for failing to produce Sergeant Alexa's notes and police recordings related to Detective Yarbrough's testimony prior to the hearing, (3) the petitioner's

efforts to represent himself were infringed by his standby counsel and by the prosecutor, and (4) the prosecutor was able to withdraw her request for an identification hearing on the ground that no "police arranged identification" of the petitioner had occurred. (Pet. Memo. at 27-44; 6/4/97 H. Tr. at 18).  These allegations fail to demonstrate the type of dysfunction necessary to qualify as an "unconscionable breakdown" under Second Circuit law.  See, e.g., Allah v. LeFevre, 623 F. Supp. 987, 991 (S.D.N.Y. 1985) (citing examples of "unconscionable breakdown," including "the bribing of a trial judge, the prosecution's knowing use of perjured testimony, and a guilty plea extracted by torture"); Cruz v. Alexander, 477 F. Supp. 516, 522-23 (S.D.N.Y. 1979) (finding "unconscionable breakdown" where trial court, Appellate Division, and Court of Appeals all failed to "make a reasoned inquiry" into petitioner's Fourth Amendment claim).  Furthermore, the fact that the petitioner succeeded in raising precisely these four objections on direct appeal illustrates that there was no "unconscionable breakdown" in the process afforded him by New York's courts -- the courts' failure to agree with the petitioner does not equate to an "unconscionable breakdown." (Pet. App. Brief at 27-34; Supp. Brief at 13-14, 28-35, 41-44).  Therefore, habeas review does not provide an opportunity for reaching the merits of the petitioner's Fourth Amendment claims.

D. Brady Violations

Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is material either to guilt or to punishment." United States v. Paulino, 445 F.3d 211, 224 (2d Cir. 2006) (internal quotation marks omitted). There are three components to a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); accord Quintana v. Armstrong, 337 Fed. Appx. 23, 24 (2d Cir. 2009). "'[M]aterial' in the Brady context does not mean material in the evidentiary sense, as Brady seemed to suggest. Rather, evidence is material in the Brady context only if 'its suppression undermines confidence in the outcome of the trial.'" United States v. Coppa, 267 F.3d 132, 141 (2d Cir. 2001) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). "The touchstone of materiality is a [] reasonable probability of a different result." DiSimone v. Phillips, 461 F.3d 181, 196 (2d Cir. 2006) (internal quotation marks omitted).

Mr. Washington identifies eight pieces of evidence that he alleges the prosecutor failed to produce in violation of her

obligations under Brady[2]: (1) the complete tape of police radio transmissions relied on by Detective Yarbrough, (2) Sergeant Alexa's notes, (3) photographs of Ms. Sanchez's injuries, (4) other photographs introduced by the prosecutor at trial, (5) Ms. Sanchez's criminal record, (6) Mr. Bentivegna's "Chief Complaint" report, (7) proof of the prosecutor's agreement with Ms. Yunen, and (8) Officer Olmo's notes.   (Pet. Memo. at 46-63).   The parties agree that all of these claims were made to the Appellate Division, either in Mr. Washington's brief or in his attorney's.[3]  (Pet. App. Brief at 35-38; Supp. Brief at 13-23).   The Appellate Division rejected these claims and the petitioner appealed, thus exhausting

---

[2] To the extent Mr. Washington is arguing that the withholding of this evidence violates People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961), those claims are not cognizable on habeas review and thus will not be addressed.  See, e.g., Martinez v. Phillips, No. 04 Civ. 8617, 2009 WL 1108515, at *23 (S.D.N.Y. April 24, 2009) ("[T]he failure to turn over Rosario material is not a basis for habeas relief, as the Rosario rule is purely one of state law."); Lebron, 2008 WL 793590, at *21 (finding Rosario allegation "not subject to habeas review because 'Rosario is not based on the State or Federal Constitution'" (quoting People v. Jackson, 78 N.Y.2d 638, 644, 578 N.Y.S.2d 483, 487 (1991))).

[3] Although the respondent states that the petitioner challenged the prosecutor's alleged failure to produce Officer Olmo's notes in his pro se supplemental brief, the document itself does not support that contention.  In an abundance of caution, I will address the merits of this claim despite the apparent lack of exhaustion.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

them for AEDPA purposes.  <u>Washington II</u>, 96 N.Y.2d 925, 732 N.Y.S.2d 643; <u>Washington I</u>, 282 A.D.2d at 376, 726 N.Y.S.2d at 7. Therefore, these claims will be reviewed individually under the AEDPA's standard of deference.

### 1. Radio Transmission Tape

Mr. Washington claims that he was not timely provided with a complete copy of the tape containing the police radio transmissions Detective Yarbrough heard on the day of the crime. (Pet. Memo. at 48-49).  He alleges it was only when he obtained and listened to the entire tape years after his conviction that he discovered it contains evidence indicating he was already in police custody when Detective Yarbrough arrived at the cemetery, thus contradicting Detective Yarbrough's testimony at the suppression hearing and at trial. (Pet. Memo. at 49; Pet. Reply Memo. at 28-29).  Presumably, if the petitioner had timely access to this tape, he could have used it to impeach Detective Yarbrough at both the pretrial hearing and at trial, which could have resulted in the exclusion of the jewelry and money found in his pocket following the arrest.

Even assuming this recitation of the facts to be true, the tape is mot material in the <u>Brady</u> sense, and thus it was not a constitutional violation for the prosecutor to have failed to produce it.  Had the jewelry and money found on the petitioner been excluded from evidence and had the jury disbelieved Detective

Yarbrough's testimony at trial, the remaining evidence was still more than sufficient to maintain confidence in the ultimate verdict.  The identification evidence against the petitioner was overwhelming -- he was visually identified at trial by the victim and four police officers in addition to Detective Yarbrough.  (Tr. at 37, 101, 187-88, 230, 292, 426-27).  Moreover, Ms. Sanchez and the officers described the perpetrator as wearing black pants, no shirt, and a pair of handcuffs on one wrist when he fled the scene of the robbery -- precisely what the petitioner was wearing when he was arrested.  (Tr. at 38, 41-42, 102, 106-07, 188, 229, 233, 294). Two of the officers explicitly testified that the perpetrator they saw in Ms. Sanchez's apartment building was the same man they subsequently observed in handcuffs at the cemetery.  (Tr. at 45, 101, 105).  Therefore, the petitioner has not shown a "reasonable probability of a different result" had he timely received the entire tape.  DiSimone, 461 F.3d at 196.

### 2. Sergeant Alexa's Notes

The petitioner next claims that the prosecutor violated her Brady obligations by failing to produce Sergeant Alexa's notes until long after the suppression hearing at which he testified. (Pet. Memo. at 49-50).  While it is true that the prosecutor did not produce Sergeant Alexa's notes until after he had testified both at the hearing and at trial, the petitioner has failed to

29

explain how the contents of the notes are favorable to his position or specify how he was prejudiced by their being withheld, aside from a conclusory assertion that he "could of made valuable use" of them.  (Pet. Memo. at 50; Tr. at 165).

### 3. Photographs of Ms. Sanchez's Injuries

Mr. Washington asserts that the prosecutor failed to timely provide him with copies of photographs of Ms. Sanchez's injuries. (Pet. Memo. at 50-51).  This alleged failure does not rise to the level of a Brady violation, however.  First, the trial record shows that these photographs were produced to the petitioner before Ms. Sanchez testified; therefore, he was not prejudiced in his ability to use them in cross-examining her.  (Tr. at 165-66).  Second, the photographs are not favorable to the petitioner -- in fact, they provided compelling evidence against him.  (Tr. at 168).  The petitioner himself recognized this fact immediately upon receiving the photographs, when he objected to their introduction on the grounds that they were "highly prejudicial and highly inflammatory." (Tr. at 166-68).  Such prejudice is the opposite of the showing required for the petitioner to make out a Brady violation, which requires that the improperly withheld evidence would have helped, not hurt, his case.

### 4. Photographs Used by the Prosecutor at Trial

The petitioner claims that the prosecutor never produced a

number of photographs that she used at trial, including images of him and of areas around Ms. Sanchez's apartment building.  (Pet. Memo. at 52).  He admits that these photographs were shown to his legal advisor, Mr. Scott, but argues that the prosecutor's failure to provide him with copies violated <u>Brady</u> due to his <u>pro</u> <u>se</u> status.  (Pet. Memo. at 53-54; Tr. at 386).   However, Mr. Washington has again failed to show how these photographs were favorable to his defense or how he was prejudiced by the prosecutor's alleged withholding of them.  Although he states that he had "to scramble to make use of the late material in the best way available," he does not specify how he would have been able to use these materials to his advantage had he received them at an earlier point in time.  (Pet. Memo. at 55).

### 5. <u>Ms. Sanchez's Criminal Record</u>

Mr. Washington next argues that the prosecutor violated her <u>Brady</u> obligations by failing to provide him with a copy of Ms. Sanchez's arrest record.  (Pet. Memo. at 55-60).  He asserts that Ms. Sanchez was arrested and prosecuted in 1996 for driving without a license and hitting a pedestrian with her car.  (Pet. Memo. at 56-57).  The petitioner has previously asserted this argument in the state courts: in 1999, he filed a motion to vacate his conviction pursuant to CPL § 440.10 based on the prosecutor's alleged failure to turn over Ms. Sanchez's arrest record.

31

(Washington 9/16/99 Aff., ¶¶ 9-11).  However, the New York Supreme
Court found that the motion was without merit because "Ms. Sanchez
has no criminal record."  (12/3/99 Order).  This finding was
adopted by the Appellate Division in its decision affirming Mr.
Washington's conviction.  Washington I, 282 A.D.2d at 376, 726
N.Y.S.2d at 7.  The petitioner has therefore failed to show that
the prosecutor suppressed evidence of Ms. Sanchez's criminal
history.  Furthermore, the trial record shows that the petitioner
was aware at trial of the facts of Ms. Sanchez's traffic accident
and arrest and used them to impeach her credibility on cross-
examination.  (Tr. at 492-94, 520-23).  Therefore, even if Ms.
Sanchez had a criminal record and the prosecutor was aware of it,
Mr. Washington has not shown that he was prejudiced by the
prosecutor's failure to produce it.

        6. Mr. Bentivegna's "Chief Complaint" Report

     The petitioner states that the prosecutor failed to provide
him with a copy of the "Chief Complaint Report" of Mr. Bentivegna,
the responding EMT.  (Pet. Memo. at 60-61).  He claims that this
report describes Ms. Sanchez having told Mr. Bentivegna that the
petitioner "'pushed in [the door] and [he] punched [her] in the
face.'"  (Pet Memo. at 60; Tr. at 632).  Mr. Washington argues that
this statement is in conflict with Ms. Sanchez's testimony at
trial, including her statement that he initially hit her in the

face either with the door or with the box he was carrying and only punched her in the face after he had entered the apartment.  (Pet. Memo. at 60; Tr. at 423-24).   He therefore asserts that the prosecutor's failure to produce the "Chief Complaint Report" prejudiced his ability to effectively cross-examine Ms. Sanchez at trial.  (Pet. Memo. at 60).

This argument is unavailing for at least two reasons.  First, the petitioner does not deny that, prior to Ms. Sanchez's cross-examination, the prosecutor produced a differently-titled report containing essentially the same information.  (Resp. Memo. at 49; Pet. Memo. at 60; Tr. at 395).  The petitioner claims that he has seen both reports and that there is "absolutely no doubt" that the "Ambulance Call Report," which was produced, differs from the "Chief Complaint Report."  (Pet. Memo. at 61).  However, he admits that the "Ambulance Call Report" contained a subsection entitled "Chief Complaint," in which Mr. Bentivegna recorded Ms. Sanchez's allegation that the petitioner "pushed in and punched me."  (Pet. Memo. at 60; Resp. Memo. at 49).  Therefore, even if the "Ambulance Call Report" and the "Chief Complaint Report" are different documents, the "Ambulance Call Report" contained the same characterization of events as was contained in the "Chief Complaint Report" and therefore provided the petitioner with the same opportunity to challenge Ms. Sanchez's testimony on cross-

33

examination.   Thus, it is not possible that the outcome of Mr. Washington's trial was prejudiced by the prosecutor's failure to turn over the "Chief Complaint Report."

Second, neither of the Reports conflict with Ms. Sanchez's testimony at trial.  Ms. Sanchez stated that the petitioner rang her doorbell and, when she opened the door, pushed the door in and entered her apartment.  (Tr. at 422-23).  The door hit Ms. Sanchez, knocking her to the ground, following which the petitioner threw or dropped the box he had been holding in Ms. Sanchez's face.  (Tr. at 424).  Ms. Sanchez next described how Mr. Washington pulled her into the kitchen and then began hitting her in the face.  (Tr. at 424).  Her statement to Mr. Bentivegna that the petitioner both pushed into her apartment and punched her in the face is therefore supported by her testimony, which describes both of those acts in sequence, albeit with other violent acts in between.

### 7. Prosecutor's Agreement with Ms. Yunen

Next, Mr. Washington argues that the prosecutor violated her Brady obligations by failing to reveal an agreement she made with Ms. Yunen pursuant to which the latter was relocated.  (Pet. Memo. at 61-62).  This allegation is false.  The trial transcript clearly shows that Ms. Broderick informed Mr. Washington in the midst of Ms. Yunen's testimony that she had helped to relocate Ms. Yunen.  (Tr. at 690).  Ms. Broderick further revealed that the reason for

34

Ms. Yunen's relocation was that Ms. Sanchez had received a phone call during which the caller offered her $1,000 in exchange for her not testifying against the petitioner and also displayed knowledge of Ms. Yunen's name and address, which caused Ms. Broderick to fear for the witness' physical safety. (Tr. at 689-90; Jury Trial Transcript dated June 11, 1997 at 2-3). The trial judge implied that, should Mr. Washington question Ms. Yunen about her agreement with the prosecutor, it was possible that the details of the threatening phone call might be revealed to the jury. (Tr. at 689-90). Following this explanation, the petitioner agreed not to ask any further questions about Ms. Yunen's conversations with Ms. Broderick and to move on to a new line of questioning. (Tr. at 691-92). This demonstrates that the petitioner was well aware of the agreement between Ms. Yunen and the prosecutor and chose not to pursue the matter as part of his defense.

8. Officer Olmo's Notes

Finally, the petitioner alleges that the prosecutor violated her Brady obligations by not promptly producing Officer Olmo's notes, as a result of which he was prejudiced. (Pet. Memo. at 62-63). However, the record reveals that these notes were produced to the petitioner before Officer Olmo testified. (Tr. at 165). Furthermore, the petitioner has not explained how these notes were favorable to his defense or specifically how he was prejudiced in

35

his ability to use them.

E. Right to Self-Representation

The Sixth Amendment protects a criminal defendant's right to represent himself at trial.  See Faretta v. California, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense."); Davis v. Grant, 532 F.3d 132, 141 (2d Cir. 2008).  In order to take advantage of this right, however, the defendant must "be made aware of the dangers and disadvantages of self-representation" and "knowingly and intelligently forgo" representation by counsel.  Faretta, 422 U.S. at 835 (internal quotation marks omitted).  In addition, the defendant's request to proceed pro se must be both "timely" and "unequivocal."  LaValle v. Artus, No. 09-4685, 2010 WL 5156849, at *1 (2d Cir. Dec. 21, 2010) (internal quotation marks omitted).

Even where a defendant has invoked his right to self-representation, "a judge may qualify it by appointing stand-by counsel, with or without the defendant's consent," for the dual purposes of (1) providing legal advice upon the request of the defendant or the judge and (2) representing the defendant if his pro se status is terminated.  Clark v. Perez, 510 F.3d 382, 395 (2d Cir. 2008).  The decision to appoint standby counsel "lies solely within the discretion of the trial court."  United States v.

36

Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989); accord Harrison v.
Walsh, No. 06 Civ. 13328, 2007 WL 1576265, at *24 (S.D.N.Y. June 1,
2007), report and recommendation adopted, 2007 WL 2844867 (S.D.N.Y.
Sept. 27, 2007).  There are two restrictions on the participation
of standby counsel at trial: (1) the defendant must "preserve
actual control" over the defense such that standby counsel is not
allowed "to make or substantially interfere with any significant
tactical decisions, or to control the questioning of witnesses, or
to speak instead of the defendant on any matter of importance"; and
(2) standby counsel's participation "should not be allowed to
destroy the jury's perception that the defendant is representing
himself." McKaskle v. Wiggins, 465 U.S. 168, 178 (1984); accord El
v. Artuz, 105 F. Supp. 2d 242, 253 (S.D.N.Y. 2000).

    Mr. Washington raised the claim that he was denied his right
of self-representation in his pro se appellate brief and sought to
appeal denial of the claim to the Court of Appeals, thereby
exhausting it.  (Supp. Brief at 41-44); Washington II, 96 N.Y.2d
925, 732 N.Y.S.2d 643; Washington I, 282 A.D.2d at 376-77, 726
N.Y.S.2d at 7.

    Turning to the merits, Mr. Washington first claims that he was
denied his right to counsel by being forced to represent himself
pro se.  (Pet. Memo. at 64-67; Pet. Reply Memo. at 34-36).  He
states that Justice Bradley failed to investigate the complaints he

raised regarding Mr. Scott's representation or to explore the possibility of appointing new counsel before allowing the petitioner to represent himself.  (Pet. Reply Memo. at 34-35). This allegation does not comport with the record.  While it is true that Justice Bradley did not conduct an extensive inquiry into Mr. Washington's complaints about his counsel, that is because the petitioner made those complaints not in an effort to get new counsel but rather in support of his motion to proceed pro se. (3/29/97 H. Tr. at 3-4).  In response to Justice Bradley's question whether Mr. Washington was "seeking another lawyer or to represent" himself, the petitioner responded, "I am seeking to represent myself."  (3/29/97 H. Tr. at 7).  Justice Bradley then conducted extensive questioning regarding the petitioner's qualifications, including his educational background and familiarity with the law. (3/29/97 H. Tr. at 8-11).  After advising Mr. Washington of the disadvantages of self-representation and ensuring that the petitioner understood those warnings, Justice Bradley again asked if Mr. Washington wanted to represent himself.  The petitioner responded in the affirmative. (3/29/97 H. Tr. at 12-13).  There is therefore no basis in the record for Mr. Washington's claim that he was forced to represent himself against his will.

Next, Mr. Washington alleges that his right to represent himself was infringed by the repeated interference of Ms. Broderick

38

and Mr. Scott at trial.  (Pet. Memo. at 63, 67).  However, he has failed to cite any instances of Ms. Broderick's interfering in his presentation at trial, and the examples he cites of Mr. Scott's interference are insufficient to violate his right to self-representation.  See United States v. Dyman, 739 F.2d 762, 771-72 (2d Cir. 1984) (finding standby counsel's participation insufficient to infringe defendant's right to self-representation because it did not interfere with defendant's ability to put on "his [own] case in his own way" (quoting McKaskle, 465 U.S. at 177; El, 105 F. Supp. 2d at 253 ("Unsolicited participation by . . . standby counsel does not necessarily violate petitioner's right to represent himself.").  Mr. Washington cites only two occasions on which Mr. Scott interrupted the proceedings. (Tr. at 166, 731-34).  Mr. Scott was quickly stopped by Justice Brandveen on both occasions, and in neither instance was the jury present.  As a result, Mr. Scott's interruptions were insufficient to wrest tactical control of the case from Mr. Washington or to undermine the jury's view of Mr. Washington's pro se status, and his actions therefore did not violate the petitioner's right to self-representation.

Finally, Mr. Washington argues that Mr. Scott interfered with his ability to represent himself by receiving Brady materials from the prosecution but then failing to turn those materials over to

him.  (Pet. Memo. at 67).  As discussed above, however, none of these alleged failures kept favorable materials from the petitioner or prejudiced his ability to put on his defense.  Therefore, they cannot have interfered with his right to self-representation.  For all of these reasons, the Appellate Division's determination that the petitioner's Sixth Amendment right to represent himself at trial was not violated was not unreasonable or contrary to federal law.

   F. Ineffective Assistance of Counsel

   A habeas petitioner's claim that he received ineffective assistance of trial or appellate counsel is analyzed according to the principles set forth in Strickland v. Washington, 466 U.S. 668 (1984).  See Ortiz v. Artuz, No. 06 Civ. 6444, 2010 WL 3238994, at *2 (S.D.N.Y. Aug. 11, 2010) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001)). Under this test, a petitioner must demonstrate (1) that the representation he received "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694; accord United States v. De La Pava, 268 F.3d 157, 163 (2d Cir. 2001).  When reviewing counsel's performance, a habeas court should be "highly deferential" and "indulge a strong

40

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As a result, "'[s]urmounting Strickland's high bar is never an easy task.'" Harrington, __ U.S. at __, 131 S. Ct. at 788 (quoting Padilla v. Kentucky, __ U.S. __, __, 130 S. Ct. 1473, 1485 (2010)).

The petitioner alleges that both his pretrial and appellate counsel were constitutionally ineffective. (Pet. Memo. at 69-89). I will address each of these claims separately.

### 1. Pretrial Counsel

Mr. Washington claims that Mr. Scott's assistance was ineffective because (1) he failed to ensure that the petitioner was able to appear and testify in front of the grand jury, (2) he did not challenge the indictment despite its facial invalidity, and (3) he refused to communicate with the petitioner for a period of time. (Pet. Memo. at 70-72, 77-79). Mr. Washington exhausted these claims by raising them in his direct appeal. (Supp. Brief at 45-46); Washington II, 96 N.Y.2d 925, 932 N.Y.S.2d 643; Washington I, 282 A.D.2d at 377, 726 N.Y.S.2d at 7.

With respect to the petitioner's first argument, federal courts typically rely on one of two grounds in rejecting such claims. First, they may apply the rule of United States v. Mechanik, which states that a defendant's conviction beyond a reasonable doubt by a petit jury cures any defects in his grand

41

jury proceeding.  475 U.S. 66, 70 (1986); see also, e.g., Montalvo v. Annetts, No. 02 Civ. 1056, 2003 WL 22962504, at *24-25 (S.D.N.Y. Dec. 17, 2003) (denying petitioner's "ineffective assistance of trial counsel claim, based on counsel's failure to preserve his right to testify before the grand jury, . . . [b]ecause any defect in the grand jury proceedings was cured by the petit jury conviction" and citing cases).

        However, the New York Court of Appeals has explicitly declined to adopt Mechanik, finding that New York law "provides for dismissal [of an indictment] upon the mere possibility of prejudice" and allows a defendant to raise claims of defects in his grand jury proceedings "even after a plea of guilty." People v. Wilkins, 68 N.Y.2d 269, 277 n.7, 508 N.Y.S.2d 893, 897 n.7 (1986); see also People v. Revette, 48 A.D.3d 886, 886-87 & n.1, 851 N.Y.S.2d 299, 301 & n.1 (3d Dep't 2008) (considering challenge to grand jury proceedings brought by convicted defendant on direct appeal because "[a]lthough defendant was convicted by a jury following a trial, this issue nevertheless survives for appellate review in New York"); People v. Bey-Allah, 132 A.D.2d 76, 81, 521 N.Y.S.2d 422, 425 (1st Dep't 1987) ("The Court of Appeals has held . . . that defects in Grand Jury proceedings may be raised on appeal, even after conviction."). In Wilkins the Court of Appeals not only declined to apply Mechanik, but also dismissed the

appellant's indictment and reversed his conviction due to flaws in the grand jury proceedings.  <u>Wilkins</u>, 68 N.Y.2d at 277, 508 N.Y.S.2d at 897.  Thus, while defects in a petitioner's grand jury proceedings are not themselves cognizable on habeas review pursuant to <u>Mechanik</u>, courts may hold that a trial counsel's failure to raise objections to such defects in state proceedings causes prejudice sufficient to constitute ineffective assistance of counsel under <u>Strickland</u>, even when the petitioner has been convicted after a jury trial.

Federal courts have also rejected habeas petitioners' ineffective assistance of counsel claims on the ground that "New York courts have consistently held that counsel's failure to ensure that the defendant testifies before the grand jury does not amount to ineffective assistance of counsel." <u>Batchilly v. Nance</u>, No. 08 Civ. 7150, 2010 WL 1253921, at *41 (S.D.N.Y. April 2, 2010) (internal quotation marks omitted); <u>see also, e.g.</u>, <u>Affser v. Murray</u>, No. 04 CV 2715, 2008 WL 2909367, at *7 (E.D.N.Y. July 28, 2008); <u>Williams v. Ricks</u>, No. 02 Civ. 2131, 2004 WL 1886028, at *7 (S.D.N.Y. Aug. 24, 2004).  But this conclusion does not follow. The federal constitutional standard in <u>Strickland</u> operates independently of state constitutional protections, and it is possible that a petitioner may be able to show both deficient performance and prejudice where his trial counsel failed to ensure

his grand jury rights.

Despite the apparent inadequacy of these two traditional approaches, Mr. Washington's claim that Mr. Scott was ineffective for failing to ensure his testimony before the grand jury nevertheless fails on the merits. The petitioner argues that, had he been produced to testify in front of the grand jury, he would have pointed out inconsistencies in Ms. Sanchez's and Sergeant Alexa's testimony, thus rendering their recitation of events incredible and precluding his indictment. (Pet. Memo. at 79-81). However, Mr. Washington's attempts to impeach these same witnesses on the same grounds at trial were unsuccessful, and he has failed to explain why his presentation in front of the grand jury would have been more convincing, especially in light of the lower burden of proof for the prosecution at that stage. Moreover, the testimony the petitioner desired to give the grand jury is utterly unconvincing. He first claims that he would have shown Ms. Sanchez to be "a l[ia]r" because she did not go to the police station to provide a statement about the alleged robbery or participate in "a line-up or photo array procedure." (Pet. Memo. at 79). However, Ms. Sanchez gave a statement to the police at her apartment, and there is no evidence that the police asked her to participate in any formal identification procedures. (Tr. at 46, 336-37, 356-57). Therefore, these allegations do not impugn her testimony. The

44

petitioner next states that, had he testified in front of the grand jury, he would have impeached Sergeant Alexa with statements made by other witnesses at his subsequent trial.   This is obviously impossible.   Mr. Washington has therefore failed to show that the outcome of his grand jury proceedings would have differed had he been produced to testify; thus, his claim fails.   Cf. Fox v. Poole, No. 06 CV 856, 2008 WL 1991103, at *8 (E.D.N.Y. May 5, 2008) (denying habeas petitioner's ineffective assistance of counsel claim, which was based on attorney's failure to effectuate grand jury testimony, where petitioner failed to show prejudice).

    The petitioner's second claim of ineffective assistance of pretrial counsel also fails.   Although Mr. Scott may not have moved to dismiss the indictment on the petitioner's behalf, Mr. Washington did file such a motion himself, which Justice Bradley rejected on its merits.   (3/29/97 H. Tr. at 2-3).   The petitioner has failed to explain how his counsel's failure to file the same motion changed the outcome of the proceedings.   The same reasoning undermines Mr. Washington's allegation that Mr. Scott refused to communicate with him for a period of time following his indictment and before the suppression hearing.   (Pet. Memo. at 70-71; Pet. Reply Memo. at 38).   The petitioner does not deny that he filed a variety of motions during that period, challenging both the validity of his indictment and the representation he was receiving

from Mr. Scott.  (Pet. Reply Memo. at 38-39).  He has not explained how the outcome of those motions, or of his case generally, was affected in any way by Mr. Scott's alleged failure to assist him during that period.  Therefore, the Appellate Division's decision denying this claim was not unreasonable or contrary to federal law.

### 2. Appellate Counsel

It is well established that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant."  Evitts v. Lucey, 469 U.S. 387, 394 (1985); accord Wynder v. Smith, No. 09 Civ. 4541, 2011 WL 70556, at *12 (S.D.N.Y. Jan. 10, 2011); see also Sellan v. Kuhlman, 261 F.3d 303, 317 (2d Cir. 2001).  "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); accord Forte v. LaClair, 354 Fed. Appx. 567, 569 (2d Cir. 2009), cert. denied, __ U.S. __, 130 S. Ct. 1521 (2010).  "To establish prejudice in the appellate context, a petitioner must demonstrate that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court].'"  Mayo, 13 F.3d at 534 (alteration in original) (internal quotation marks omitted) (quoting Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992)).  When appellate counsel is faulted for failing

to raise a particular claim on direct appeal, if that claim is "not meritorious, there can be no merit to the claim that appellate counsel should have raised it." <u>Jeremiah v. Artuz</u>, 181 F. Supp. 2d 194, 200 (E.D.N.Y. 2002).

Mr. Washington claims here that Mr. Lewis was ineffective because he (1) refused to assert meritorious arguments despite the petitioner's having made him aware of them, (2) did a poor job of presenting the arguments he did raise, (3) failed to file a reply brief, (4) did not argue that the petitioner received ineffective assistance of pretrial counsel, (5) refused to assert all of the <u>Brady</u> and <u>Rosario</u> violations identified by the petitioner, (6) failed to convincingly argue that the trial evidence was insufficient to support the convictions, and (7) did not challenge the "predicate felony statement" underlying the sentence. (Pet. Memo. at 81-89; Pet. Reply Memo. at 39-41). However, the petitioner has failed to exhaust any of these claims. His first coram nobis petition, which raised the first two issues complained of here, was denied and not appealed to the Court of Appeals; the second, which the petitioner did appeal to the Court of Appeals following its denial, did not include any of the issues raised here. (Pet. Memo. at 1; Resp. Memo. at 17 & n.5; Memorandum of Law, attached as part of Exh. VV to Rodriguez Decl., at 17-27; 2/27/07 Certificate). Because the petitioner has failed to exhaust

47

these claims, they are not ripe for review.

In any event, these claims fail on the merits.  A review of Mr. Lewis' brief shows that the arguments he chose to raise were well-selected and well-argued, despite the ultimate outcome.  Mr. Lewis' decision not to file a reply brief disputing the prosecutor's knowledge of Ms. Sanchez's arrest does not constitute ineffective assistance of appellate counsel because the pertinent legal consideration for this purported <u>Brady</u> claim was not whether the prosecutor was aware of Ms. Sanchez's <u>arrest</u> but whether she withheld a copy of Ms. Sanchez's <u>criminal record</u>.  <u>See</u> <u>Smalls v. McGinnis</u>, No. 04 Civ. 301, 2004 WL 1774578, at *32 (S.D.N.Y. Aug. 10, 2004) (finding failure to file reply brief not ineffective assistance of counsel where petitioner "has not demonstrated that a reply brief or oral argument would have changed the outcome of his appeal").  Finally, the specific arguments the petitioner claims his appellate counsel should have asserted are without merit, and therefore it was not ineffective assistance for Mr. Lewis not to raise them.  For these reasons, this asserted ground for relief should be denied.

G. Independent Source Hearing[4]

Mr. Washington claims that the prosecutor failed to provide him with appropriate notice pursuant to CPL § 710.30 for Officer Colon's visual identification of him at the suppression hearing or Ms. Yunen's visual or voice identification of him at trial. (Pet. Memo. at 92-96). The respondent argues that this claim is not exhausted. (Resp. Memo. at 60). However, the petitioner raised this claim in his pro se supplemental brief, and it was rejected by the Appellate Division. (Supp. Brief at 32-35); Washington I, 282 A.D.2d at 377, 726 N.Y.S.2d at 7. He then appealed that decision, thereby exhausting the claim. Washington II, 96 N.Y.2d 925, 732 N.Y.S.2d 643.

Section 710.30 provides in relevant part that the prosecution must serve notice upon a defendant of its intention to offer "testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has

---

[4] Although Mr. Washington frames this ground for relief as the trial court's failure to conduct an independent source hearing, he apparently misunderstands the purpose of such a hearing. From the substance of his argument, it is apparent that Mr. Washington is challenging the trial court's decision to allow various of the prosecutor's witnesses to identify him as the perpetrator -- both at the suppression hearing and at trial -- without giving him proper notice of the basis for those identifications. (Pet. Memo. at 90-91). I have chosen to address this claim based on its substance rather than its title.

previously identified him as such . . . ."  CPL § 710.30(1)(b).
However, violations of § 710.30 do not implicate the Federal
Constitution and thus are not cognizable on habeas review.  See,
e.g., Brown v. Woods, No. 07 Civ. 10391, 2010 WL 2605744, at *4
(S.D.N.Y. June 29, 2010) (finding § 710.30(1)(b) "only requires the
disclosure of witnesses who previously made out-of-court
identifications of the defendant"); Soto v. Donelli, No. 06 Civ.
5816, 2010 WL 4242602, at *6 (S.D.N.Y. April 8, 2010), report and
recommendation adopted, 2010 WL 4258879 (S.D.N.Y. Oct. 27, 2010).

     Mr. Washington's § 710.30 is therefore not cognizable on
federal habeas review, and this Court has no obligation to review
its merits.  Even looking to the merits, however, this claim fails.
Notice pursuant to § 710.30 is only required for witnesses whose
identification is based on a police- or prosecutor-arranged
procedure.  See Brown, 2010 WL 2605744, at *4 (finding §
710.30(1)(b) "only requires the disclosure of witnesses who
previously made out-of-court identifications of the defendant");
Lewis v. Bennett, 328 F. Supp. 2d 396, 412-13 (W.D.N.Y. 2004)
(citing state cases holding same). The respondent states that there
were no police-arranged identification procedures used in the
investigation or prosecution of the petitioner and, thus, the
petitioner was never entitled to notice pursuant to § 710.30.
(Resp. Memo. at 61; 6/4/97 H. Tr. at 18-19).   Although the

petitioner disputes this assertion and alleges that Ms. Yunen and Ms. Phillipeaux were both shown photo arrays, he has not identified the source of this belief, stating merely that "the facts will show" it to be true.  (Pet. Reply Memo. at 43-44).  Such a conclusory assertion is insufficient to create a disputed factual issue.

H.  Theory of the Case

Mr. Washington alleges that the prosecutor impermissibly altered her theory of the case in the middle of his trial, thus undermining his ability to mount a coherent defense.[5]  (Pet. Memo. at 96-102).  In particular, he objects to the prosecutor's varying explanations for how he gained entry into Ms. Sanchez's building. (Pet. Memo. at 96-99).  He raised this claim on direct appeal in his supplemental brief; when it was denied by the Appellate Division, he sought leave to appeal to the Court of Appeals. (Supp. Brief at 50-51); Washington II, 96 N.Y.2d 925, 732 N.Y.S.2d 643; Washington I, 282 A.D.2d at 377, 726 N.Y.S.2d at 7.  This claim is therefore exhausted.

---

[5] To the extent that the petitioner is also objecting here to other aspects of the prosecutor's conduct during trial, the Appellate Division found these claims to be unpreserved and declined to review them in the interest of justice.  (Pet. Memo. at 99-100); Washington I, 282 A.D.2d at 377, 726 N.Y.S.2d at 7.  The petitioner has not made any showing of actual innocence, cause and prejudice, or improper application of the procedural bar; therefore, I will not address the merits of these claims.

The Fourteenth Amendment protects a criminal defendant's right "to fair notice of the charges against him." LanFranco v. Murray, 313 F.3d 112, 119 (2d Cir. 2002). Such notice is essential to a defendant's ability to "'present his defense without being taken by surprise by evidence offered at trial.'" Armatullo v. Taylor, No. 04 Civ. 5357, 2005 WL 2386093, at *18 (S.D.N.Y. Sept. 28, 2005) (quoting United States ex rel. Richards v. Bartlett, No. 92 CV 2448, 1993 WL 372267, at *4 (E.D.N.Y. Sept. 9, 1993)). However, the Second Circuit's jurisprudence allows prosecutors "significant flexibility" in how they present their case at trial, "provided that the defendant was given notice of the core of criminality to be proven." United States v. Kelly, 368 Fed. Appx. 194, 197 (2d Cir. 2010) (emphasis in original), cert. denied, __ U.S. __, 131 S. Ct. 349 (2010).

The petitioner has failed to demonstrate a shift in the prosecutor's theory sufficient to undermine the notice of the charges provided by his indictment. The "core" of the prosecution's theory, and of the charges, was that Mr. Washington posed as a delivery person so as to gain access to Ms. Sanchez's apartment, following which he assaulted her and robbed her of jewelry and money. Although Ms. Broderick may have supplemented these allegations with additional details as to the precise means of Mr. Washington's entry into Ms. Sanchez's building, such changes

52

did not undermine his ability to mount a defense to the primary thrust of the charges against him.  Therefore, the Appellate Division's decision to deny this claim was not unreasonable or contrary to federal law.

I. <u>Interference at Trial</u>

The petitioner next alleges that he was denied a fair trial due to Justice Brandveen's "constant" and improper interference in the proceedings.  (Pet. Memo. at 102).  In particular, he alleges that Justice Brandveen (1) interjected disproportionately during the petitioner's presentations, (2) inappropriately questioned a number of witnesses with respect to lighting conditions at the crime scene, (3) kept the petitioner handcuffed and surrounded by eight armed guards during the trial, and (4) failed to provide the petitioner with daily copies of the trial transcript.  (Pet. Memo. at 102-07).

The first two of these claims were raised by the petitioner in his supplemental appellate brief and rejected by the Appellate Division as unpreserved.  (Supp. Brief at 52-53); <u>Washington I</u>, 282 A.D.2d at 377, 726 N.Y.S.2d at 7.  The second two claims were not raised on direct appeal, although New York law requires record-based claims to be raised on direct appeal before they may be collaterally reviewed.  <u>Oliveri v. New York</u>, No. 07 Civ. 8262, 2010 WL 5620926, at *6 (S.D.N.Y. Dec. 29, 2010) (referring to New York

law's "'requirement that issues arising from the face of the trial record be raised by direct appeal'" (quoting Clark v. Perez, 510 F.3d 382, 391 n.4 (2d Cir. 2008))), report and recommendation adopted, 2011 WL 197240 (S.D.N.Y. Jan. 20, 2011); Jackson v. Lee, No. 10 Civ. 3062, 2010 WL 4628013, at *21 n.31 (S.D.N.Y. Nov. 16, 2010), report and recommendation adopted, 2010 WL 5094415 (S.D.N.Y. Dec 10, 2010).  Both New York's preservation rule, embodied in CPL § 470.05(2), and its rule requiring that record-based claims be brought on direct appeal are "firmly established and regularly followed" such that they provide independent and adequate state law grounds precluding federal habeas review.  See Garvey v. Duncan, 485 F.3d 709, 720 (2d Cir. 2007); Dixon v. McGinnis, No. 06 Civ. 39, 2010 WL 3260459, at *8 (S.D.N.Y. June 9, 2010).  Because the petitioner has not alleged actual innocence, cause and prejudice, or improper application of these rules, his claims with respect to Justice Brandveen are procedurally barred and cannot be considered on their merits.  Therefore, this asserted ground for relief should be denied.

    J. <u>Sentence</u>

A court has "'wide discretion'" in choosing the type and source of information to consider in imposing a sentence. Williams v. Philips, No. 02 Civ. 5811, 2003 WL 21961127, at *7 (S.D.N.Y. Aug. 18, 2003) (quoting United States v. Pugliese, 805 F.2d 1117,

1122 (2d Cir. 1986)).  Conversely, "a defendant has a due process right to question the procedure leading to the imposition of his sentence." <u>Pugliese</u>, 805 F.2d at 1122 (citing <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977)).  That right is violated where a defendant is "sentenced on the basis of 'materially untrue' statements, or on 'misinformation or misreading of court records.'" <u>United States v. Prescott</u>, 920 F.2d 139, 143 (2d Cir. 1990) (quoting <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948); <u>see also</u> <u>United States v. McDavid</u>, 41 F.3d 841, 844 (2d Cir. 1994) ("A sentence based <u>in part</u> on material misinformation may not stand.").  As long as a petitioner demonstrates that it is "'quite probable'" that the sentencing court relied on misinformation, actual reliance need not be shown.  <u>Lewis v. Phillips</u>, No. 04 Civ. 1117, 2009 WL 362290, at *3 (S.D.N.Y. Feb. 13, 2009) (quoting <u>King v. Hoke</u>, 825 F.2d 720, 724 (2d Cir. 1987)).  However, the trial court's error in relying on such information must be "'so egregious, that if accurately presented to the sentencing judge a different result would have been reached.'"  <u>Williams</u>, 2003 WL 21961127, at *7 (quoting <u>Warren v. Miller</u>, 78 F. Supp. 2d 120, 131 (E.D.N.Y. 2000)).

Mr. Washington challenges his sentence on the ground that Justice Brandveen improperly adjudicated him a second violent felony offender, a designation that significantly increased his

sentence.  (Pet. Memo. at 107-08).  He argues that the prosecutor failed to meet her evidentiary burden and that Justice Brandveen's holding therefore relied on material misinformation in violation of his due process rights.  (Pet. Memo. at 107-08, 112-16).  The Appellate Division reviewed this argument on its merits and denied it.  Washington I, 282 A.D.2d at 377, 726 N.Y.S.2d at 7.  Mr. Washington appealed this denial to the Court of Appeals, thus exhausting this claim.  Washington II, 96 N.Y.2d 925, 732 N.Y.S.2d 643.

However, this claim is without merit.  Even if Mr. Washington were correct that the prosecutor offered insufficient evidence regarding his prior criminal history, he has not denied that he was in fact previously convicted of a violent felony and incarcerated for the periods alleged by the prosecutor.  (Pet. Memo. at 112-16). Therefore, he has failed to sustain his burden of showing that, had Justice Brandveen conducted a more thorough investigation, he would have arrived at a different result regarding the petitioner's status as a second violent felony offender.  As a result, the Appellate Division's decision to deny this claim was not unreasonable or contrary to federal law.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Washington's petition for a writ of habeas corpus be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.   Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, Room 640, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.   Failure to file timely objections will preclude appellate review.

                    Respectfully submitted,

                    JAMES C. FRANCIS IV
                    UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           March 30, 2011

Copies mailed this date to:

Dexter Washington
98-A-0228
Sullivan Correctional Facility
PO. Box 116
Fallsburg, New York 12733

Leilani Rodriguez, Esq.
Assistant Attorney General
Federal Habeas Corpus Section
120 Broadway
New York, New York  10271